Good morning, Your Honors. Matthew C. Bassett, appearing on behalf of the Plaintiff Appellant. First, I'd like to address the new development in a case law that's specifically directed regarding Hawaiian law on the topic of issue, specific learning disability evaluations and issues that are not brought to us in briefs. Well, the issue, under the number of papers brought... You're saying an issue that has not been in your brief or litigated in the district court. It is a subsequent change in law, and so I think the court would have Generally, under motions for reconsideration, if there's any change in law that was not known at the time... It's not a motion for reconsideration. Yes, well that would be the same or similar... Michael P. is a case out of Hawaii. It's not like it should have been unknown to you. It was filed a number of months ago, too, and it was not brought to our attention just very recently. Yes, well it was... It came to my attention after I filed my final reply brief, so it was not available to me to brief at that time, so the only thing I could do was do a 28-day letter, bring to the attention of the court that there was a change in the law regarding eligibility standards in the state of Hawaii, based by Judge Pertuson's well-reasoned decision that the state was denying children a fate by mandating the use of a severe discrepancy model. It's not an issue if you haven't made it an issue in your briefs or in previous litigation. I still don't understand how you would like us to address it. It is an issue to the respect that I challenged the hearing officer and the district court's analysis of the eligibility requirements. But you never said that Hawaii used the wrong test, even though that was staring you right in the face. Well... Everybody must have known that Hawaii was late in implementing the new regulations. In fact, counsel, it appears from your briefs, if I'm correct, that you argued that the federal law had been changed, but Hawaii had not adopted the changes, and you argued that Hawaii law controls. I know that Michael P. apparently came to your attention subsequent to that, but it seems like you and a number of people knew that there had been a change in the law, but you submitted that Hawaii law controls. So just that point, in light of what Judge Trotter said, I'm just trying to figure out what we can do, but even so, let's just get to the severe discrepancy issue, because I'm not sure how it helps you at this point, but I want to know if you think that it does, because it seems that you are arguing that your client suffered from a disability that led to a special education, and it's your burden to show that, and I think you argued one of many several arguments that you made in your brief, that there was a severe discrepancy, but you also have to show, and that's still true under the current law, that the student wasn't achieving commensurate with age and ability level, and with the appropriate learning experiences, so I'm not sure how you meet the second prong based on the record in this case. The law in Hawaii is that if, and it's on the eligibility sheet on my second excerpt from record at 86, that if there is a severe discrepancy between your testing and your ability, that you shall be found eligible. You shall be found eligible under the rubric of specific learning disability. Sorry, but didn't the law change to say that it's now optional? You can't require the severe discrepancy model per se, but it's now optional for each local school district to decide, so I'm not quite sure how that ruling in Michael P. that it's no longer required helps you in this case. Well, it helps because the eligibility team did not consider RTI. They didn't have to under the law, even the new law, that they didn't have to do that. The new law under Michael P. is that it's no longer required that they consider RTI and other, I guess, possibilities, but the judge, the administrative hearing officer and the judge in this case saw all of the facts that were presented, including the argument on severe discrepancy, which you offered as a basis for determining special education. You didn't offer anything else. I understand that that was what you chose under your impression of the law, but I still don't know how that changes substantively where we are, and maybe your argument might be better directed to that point. The reason I chose the severe discrepancy thing is because the hearing officer merely concluded in his decision that there was no severe discrepancy. That is clear error, and the same with district court. But there's a two-part test. Let's just say for argument, but I'm not sure that the administrative hearing officer said that. He just said it's not clear that it was statistically supported. Now, so how do you win on the second prong? Well, the second prong under the rubric, and I would direct you to the re-evaluation for specific learning disability worksheet that the department uses, that the second prong is only whether or not there are disabling elements that would find you not eligible. That is lack of appropriate instruction or lack of appropriate instructions in math, limited proficiency in English, et cetera, mental retardation or emotional disturbance. These, if the learning disability is primarily due to those, then you discount that. Otherwise, you automatically find it. Chase, you're dealing in abstractions. If you look at the hearing officer's report, you see that her teachers testified that she was doing quite well. Does that mean we have to beat that to death? Because you know that Harrington, Doherty, and Malasada all said she was doing quite well. At one point she was sixth in one of the grades. She was making progress. So when you strip aside all these rules, regulations, you know, if you wait until I finish, that's kind of a problem. If you strip aside all of those and you look at the evidence that was before the hearing officer, she's doing quite well, or she was doing quite well three and a half years ago. How do you deal with that? Because that is, she was not doing quite well. See, that's the problem. The hearing officer made findings that she was, and you've got to show us that those are clearly erroneous. You had her three teachers say that she was doing pretty well, and if I look at that, it appears to me on the face of it that that's correct. Okay. The flaw in that analysis is simple. First of all, under the guidelines for finding for specific learning disability, you do not look to the screenings of teachers. That is strictly prohibited under CFR 34, section 300.302. Screenings are not used in determining whether. Are you saying that the evidence before the hearing officer that came in from these teachers was strictly prohibited and it shouldn't have been there? Well, you can consider it, but it cannot be considered to be data for determining a lack of progress. What can you consider? Well, the screenings by the teachers cannot be used for the determining of eligibility. Secondly, they can be considered for observations of how she's adapting in the classroom, but as far as determining eligibility, which is the issue before this forum, eligibility, and you also have to look at the data that the hearing officer disregarded and put in my brief that she was getting straight F's in her testing. Now, she had a deficiency in reading comprehension. She couldn't understand what she's reading, and as a result of that, she got straight F's. Just a second. Your argument is a little difficult to track, as was your briefing. When you say she got straight F's, that just counters everything that's in the record that the administrative hearing officer relied on. So I'm not sure where you're coming from where she got straight F's. Well, she got straight F's in her testing. In which testing? There was a lot of testing done here. There were three assessments of this child, of this student, all done, it appears, from the record before us, very diligently by the teachers. When she transferred from public to private to public school, everybody looked at it. There were some issues that were identified. No one denied that. Everybody assessed, and I'm just trying to figure out, some of the testing she was getting, or some of her grades she was getting A's and B's. Some of them were C's. There was a point where it was determined that she struggled in reading and math. She was given some appropriate supports, it looks like, with math lab and equivalent reading lab. So I'm not sure where you're coming from when it comes to that point, and where within all of your arguments, which you've made several, that the wrong standard was applied and the Raleigh standard, that the child find claim, that the assessment required a good look at it, that it wasn't made. And I'm trying to figure out where your statement here, which I don't find in the record supported that she made straight F's, fits into all of the numerous claims that you have here. Well, and I included, and I refer to it in my excerpts of record that Miss, in the history class, where she was supposedly in the top third of the class. Again, she was put in a freshman class that was full of sophomores. She received straight F's in her testing in that course. She was given a B plus in her class participation that balanced out to a high grade. It's not meaningfully, you cannot benefit meaningfully if you flunk all your testing, and the teacher merely masks your deficiencies by giving you high grades for participation. How does that fit into your argument here before this court, that the administrative hearing officer of the district court committed clear errors? Because if you're not doing well in your testing, you're not meaningfully benefiting from your educational experience. Just getting grades is not part of the rubric, and you determine eligibility for a specific learning disability. When you say testing, what do you mean testing? Her quizzes and her final test. And the same with her science. You're saying that if we look very carefully at Molly Ellis' records that are in the record, we're going to find that she flunked everything, and she got a C plus anyway in the final course, an interim grade. Yeah, she flunked all her testing. They gave her credit for class participation and projects. And so these, they're only grades of 20. Is that what they do for all the students? No. When I was a freshman, you got 25% for midterm, 50% for final. Were you a freshman? I was a freshman in high school one time. Let me ask you an atmospheric one. This case is about a young woman, a young girl, and her appropriate education. We're dealing with a case that's probably three and a half years old. The testing that we're talking about was done when she was entering ninth grade. She's now presumably halfway through, what, her junior year? Yes. A lot has happened between the three and a half years. When was the last time you saw your client? I spoke with the parent. Well, they're on the Big Island, so I talked to the parent last year. Last year? Yeah. How's she doing in school? The last, she had flunked out of school. She had gotten straight F's in all her core subjects her sophomore year. I brought that to the attention of the district court, and the district court said, well, getting straight F's in Algebra I, which is her freshman math class, straight F's. Straight F's in science and straight F's in U.S. history. She had flunked out of her sophomore year. Her mother had thrown her out of the house. She's now in therapeutic foster care and was going to a special school. She still was not certified for special education, but she got thrown out of school. A new case should have been brought based on new facts and circumstances. Was a new case brought based on these new facts and new circumstances? The parent declined to go on a new case because she had no more faith in the department to find her child eligible because of so many broken promises and just the strain of doing it. What is this case all about, then? This case is about to review and go over again the worksheet for eligibility, find that she has a two- What's the bottom line? Let's say we rule in your favor. What happens? What are you trying to cause to happen? This girl needs services. She needs compensatory education in the form of tutoring so that she'll be able to How does that work when the client doesn't want to be involved anymore? The parent does not want to file for due process again. Where are we going? I don't know where this is going. The adopted mother wants services for her child. She would like her child to succeed. If she gets compensatory services, finding that she is eligible for special education, that the school wrongfully declined to find her eligible, give her compensatory services so that she can at least try to be able to make it in society, to find work and avoid the pitfalls of welfare and Section 8 housing. Specifically, we have to say something that causes something to happen. What are you trying to cause to happen? I would like the state to find, to reverse the court, to find that she is in fact eligible for special education under specific learning disability because she has two standard deviations. There is a severe discrepancy. What happens? What is the state then required to do with her? The state would be required to contact her and offer her compensatory educational services so that she'll be able to make it in school, that she can finish high school. If she had dreams of going to college, which are dashed right now, she'll at least take five or six years to get out of high school. Without the protection of the penumbra of special education, she's doomed to fail. Can you do that? Can you just file a new case? You can file a new case. Do you have circumstances and records that, if you're right, are bulletproof? It took over a year just to get in front of a hearings officer. This group of Department of Education persons were adamant about not getting her certified. So they didn't care what the evidence was. And the evidence clearly showed on the worksheet that she had two standard deviations below the norm. Yet they found no severe discrepancy. Without explanation. The hearing officer also did not do the math on that thing. And also, if you look on the worksheet, they did not have the mandatory persons, even at the eligibility meeting. On the Michael P., you have footnote 4, that under 34300.308, you need to have an examiner at the eligibility meeting to explain the evaluation data. I'm sorry, sir, but you're beyond your time, and so I'll give you a couple minutes for rebuttal. We have to deal with the record before us, and you've stated some facts here that aren't part of the record that was with the hearing officer in the district court. But you can be seated, and I'll give you two minutes for any rebuttal. Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Deputy Attorney General Chris Montgomery, representing the Department of Education, the defendant, and appellee on this matter. I believe the record is clear. I argued, actually had the opportunity to argue this case, so I am very familiar with what happened in this particular situation. There were actually three eligibility meetings that were convened at the request of parent. And there have been some situations, I must admit, that schools have either disregarded information or chosen to just utilize one source of information in determining eligibility. This was not the case. The Department of Education considered all the available information, all the standardized assessments that were conducted. Within a year, some of the assessments were conducted, I believe four to five months prior to the eligibility meeting, well within that period of time that would have the assessments be considered valid. In addition, what the school did was obtain information from that Kona Adventist School where the student had been attending for her middle school years. They received grades as well as they were able to conduct an observation. And to see her peer interaction, her ability to socialize with her peers and her performance. The school also obtained information from the teachers, from the Kona Adventists. The counsel says that she's blunked all of her tests. What's your understanding and what's your response to that? My response is that that is not correct. She had initially failed a couple of the quizzes, but I must point out a correction. It was specifically testified by the history teacher that this class was not a freshman class, but in fact was a sophomoric class that happened to include this student and another student who were freshmen. So in all due respect, the student was actually keeping up and doing quite well in actuality with students that were actually older than she was. Not the other way around. This is Molly Sutton. That is correct. Now the other side says she flunked everything and they created a phony grade for her. They were a C+. This is certainly encouraging her to go along. And that is not correct. And where do we go to the record to find out what really happened? Well, actually the transcripts with respect to Ms. Santa-Eles are very descriptive as to what are the requirements, what she considers. It is true that in her class, because it's very project-intensive, group-intensive, and there's also a presentation required in her class, that she recognizes that not all students perhaps test well or do quizzes well. Did she flunk all the tests or not? She did not. Where do we find it? He's saying yes, you're saying no. Where do we find the answer in the record? It would be in the transcripts that are cited with respect on the record. That's not in the excerpt of the record? The transcripts are not? I'm not certain. It might not be in the excerpts of record, the entire transcripts. But that's—I do. Do you put your fingers on them with the speed of light? Yes, I try. See, this happens all the time. One side says it was green, the other side says it wasn't green. I don't know what this is. Now, is this the transcript with the Florida hearing officer? That is correct. In there, he recited something about grades that were testified to by the teacher. There were several teachers. One was Ms. Nancy Arrington. She was the READ 180 program teacher. I believe that specific course was—the student actually was made eligible for that specific course because of the fact that she had some limitations in the area— The READ 180 course. That is correct. She had some limitations in the reading comprehension. That specific course is not offered to all DOE schools in the state of Hawaii. But in this specific school, it was. And it does enhance and provide tools for students that are behind, especially in the area of reading comprehension. If he said psi, I was confused. Okay. Thank you. Well, you're not going to be able to find this quickly. Can I ask you about Michael P., what the significance is from your perspective? Well, the significance in this particular situation I don't think truly has any bearing because in actuality the school, regardless of the change in the rules, Chapter 60 now, that's basically aligned with the federal law, nor this recent case law would change the course and manner of what the school did. So you're saying a procedural error is harmless in this case? Absolutely, because they did everything— And their eyes dotted. And they wanted to make certain that they had all the information to ascertain whether or not the student could be made eligible for special education and related services. And when the school found that there wasn't information to ascertain that she was eligible, then they went down a notch and then they found her eligible for a 504 modification plan. So they didn't just dismiss the student and say, well, you don't meet eligibility requirements, so too bad, so sad, go away, you're a general education student. They went and made a full intensive specific modification plan that incorporated preferential seating, closed format, the math lab, which was one area I believe that was of her weakness, as well as the READ 180 that would enhance her actual reading course. That is correct. They are renewal programs that are offered to the general ed population. In this specific case for the student, the school found that to make sure that she was provided a modification plan, that it would also incorporate those accommodations of the enhancements, the READ 180 program and the math lab. In addition, I want to add, there was also tutorial services that were offered to the student, but mother declined to take advantage of those tutorial services so that that could also assist the student in maintaining the parent. And might I add, there's been a lot of apparently new information that has been brought to your attention. I might want to also add that what came up at the hearing itself was the fact that this child, although she was adopted by two individuals, was actually living for the majority of the time with her foster parent. So there were a lot of other underpinnings aside from the educational program that was going on that could indeed have caused interference in the student's performance. Nonetheless, the school really did what was in her best interest. And when she was... Let's say we don't agree with you. Let's say we rule in favor of the appellate teacher. What happens in your view? What happens is she would be placed in a more restrictive environment with individuals that would be receiving the specialized instruction. How do you cope with that three and a half years later? Well, I would cope by saying if there was this particular school... You have to go offer her a place in the public school system at an appropriate level and give her the special services that she needs. Is that what you're telling me about? If your Honor's ruled in the favor of the plaintiff, then what I'm assuming is what's being requested is compensatory services or a payment. Whatever cost the parent had paid out of pocket for the past three and a half years, that is what they're asking to be recouped as far as some reimbursement. How old is she now? How old is the student? Well, she was 15 at the time when this case originated. So she was 15 at the time when this case originated. This was a 2009 case. Absolutely. She's really nearing that point of being considered emancipated or an adult and not actually under the age of majority. We have a little bit of time left. We can hit some of these. There's a number of claims raised in the briefing. But one is that the district court used the wrong standard to determine whether CM was eligible for special ed under the IDEA. What's your response to that? My response is I've perused very closely the decision by the district court. And I think the district court, as it pointed out, took this case to very careful consideration in all the facts. Well, the standard as if you're referring to the new Michael P. standard. No, well, the claim was the Raleigh standard. It's a two-pronged test. And it's kind of unclear from the briefing. But I think what was being alleged in the brief is that he used the wrong standard. I think the standard was used, but I think ultimately the argument was that it didn't. It shouldn't have been applied the way it was. As far as with the Raleigh standard, my argument would be that there is more than ample evidence presented from the state to show that, in fact, as a result of the carefully tailored modification plan for the student, she did indeed receive meaningful educational benefit. And I think the record is clear. There was nothing to refute. Parents produced, but, you know, just the foster parent and parent to testify. There was no one from the previous school, no other, you know, professionals, except for the psychologist, who was not able to refute her performance or what was going on in the school setting itself. The appellant puts a lot of emphasis on the case of Clovis, which is a district court case from the Eastern District of California, for this first issue on whether the wrong standard was applied. And then also when claiming that the district court committed error by determining that CM's needs could be met in a 504 plan. What's your response to that? Well, my response in this particular situation was, is I know for certain that what the school did was look at all the different prongs and actually carefully analyzed each prong of the eligibility requirements. Didn't just decide on the first prong and then disregard all the other criteria. They actually looked at every situation to see whether or not there was information to ascertain that she indeed met the criteria under all the disabilities that were presented by parent. Not just the central auditory processing disorder, but also OHI for her attention deficit hyperactivity disorder, which, by the way, the record is clear, there was no formal assessment that was conducted by the psychologist. There was just a letter that said basically this child has this diagnosis. What was asked for the doctor was could you provide us a clear assessment so that we know that you actually did the formal testing to ascertain and make the diagnosis of the ADHD. Nonetheless, the school did look at all different areas of suspected disability. And they looked at all the information that was available, including assessments, including performance, including grades. And then at the last juncture of the second eligibility meeting, the school actually said we'll come back and see after three weeks how she's performing. And then if she's not performing well, we will revisit and see whether or not she needs to be perhaps made eligible for special ed and related services. In August, it was clear that she had started to perform better than she had done in the past. So there was actual evidence to show that the modification plan was working, that she did not require special education and related services. Well, I think you can't consider the teachers as far as at the specific DOE school for purposes of the initial eligibility. But we must be mindful that in this particular case, there were three eligibility meetings, the last one of which the school said, you know what, to the parents,  we will be willing to meet again. We will convene after about three and a half weeks and see, based on her performance, based on what is produced from her teachers, as to whether or not the modification plan is working. In that respect, I would disagree with plaintiff. And I would say in the third eligibility meeting, it was actually essential to have that information, that piece of information. That's when the three teachers came in and said, here's what's exactly. Absolutely. They said, this is what we provided under the modification plan, and it worked. And it worked well. Thank you very much. Thank you very much. Mr. Bassett, I'll give you two minutes. Do you have the transcript of the system you've been talking about, about flunking all the quizzes? Yes. That would be on, Ms. Argent, that's an excerpt of record volume one at the 74. This, Molly said, the world history grades. And I stand corrected on one test, she did receive a D. But for her, on examination, she testified that she had flunked all her tests at 74. Are you paraphrasing or reading her testimony? I'm reading from the test. The test here is that she got an F on her jigsaw quiz, 30% F, 0.8 credit. Chapter one test, Towards Civilization, 829, 52% F, 0.0. Chapter two test, First Civilization, 30% F, got a negative 1.9% credit. On her chapter three test, which is Aryan Chang Zhao, she has 65% and a D, with a 1.1%. So that was her testing for the history class. How did she explain that, giving her a grade of C+, and placing her 6th, that was 24th? Well, the way it worked out is that it states on here how she grades, is for assignments, she gave her a C. On testing quizzes, gave her 52% straight F. She got a B+, an 88% for participation in the class. And so that was the kicker. And because of the participation, that's 25% of her grade. You get as much credit for participating as you do for the testing. That's true for all the students in that course, isn't it? Yes. And for projects, she got a D-, which is 30% of the grade. And so it just goes to factor that here is a girl that got Fs on all her quizzes and tests, and still managed to be in the top half of this particular class that was full of sophomores. And my suspicion that this was a special motivation class is for sophomores that had flunked their world history class weren't getting a second chance to get an easy credit, because obviously the rigors of this class do not match up to what you would expect out of a high school. If you get virtually Fs in all your tests, then you get at least a 59% or 52.4%. And the same in the excerpts of record and the science, she got a 60% in her tests and quizzes. So she got a D-, one point less, and she would have gotten an F in her testing and her science. So in Nancy Arrington's class, in the READ 180, you have to petition to get in that class. You have to prove you have a three or more grade level deficiency in reading. They don't let anyone in that class. Only, and of course Ms. Arrington said, it's for students with disabilities. It's not a regular education classroom. So the fact that she was doing well in a remedial reading class does not comport to the analysis that she is in a regular education. So you're saying that when the district court saw that or the hearing officer saw that as part of the regular curriculum, that's just wrong on its face? It's just wrong on its face. It's clear error. And again, I think the most important thing in the Michael P. decision is the correctability analysis that district court made a big thing about the correctability. Even though the district court inexplicably found that there was no severe discrepancy, said that under the Hood case that you can use correctability, and he cited through the California statute of correctability. Hawaii has the same and similar, but on their worksheets you don't use correctability. It's not applied in Hawaii. Thank you. Thank you, Mr. Besson. Thank you. Thank you for your presentations here this morning. Your argument of the case will be submitted to the panel for consideration.
judges: Goodwin, Trott, Murguia